5-11-0255. Council, please. May it please the Court, My name is Cedar Powers and I represent the Avalanche Allied Van Lines in this appeal. This appeal stems from two claims filed by Mr. Russell for an undisputed worth action which occurred on July 15, 2000. One claim was filed against Allied Van Lines and my client. One claim was filed against A1 Moving. The claims were consolidated for purposes of trial. Just briefly, the arbitrator and the commission decided this was an employment relationship dispute principally. The arbitrator and the commission decided that there was not an independent contractor status for Mr. Russell, that Allied Van Lines was the employer, and that A1 Moving was not the employer. Due to time constraints, I'm going to limit my arguments today as it involves this threshold issue, the employment status issue. I will stand by the contents of my brief as it involves the other issues on causation and T.D. The exhibit issue, you're going to rest on your brief on the exhibit issue? On those other issues, I will rest on the brief. I think causation over two intervening potentially that were involved. T.T.D. issue and those arguments, I will stand by. The specific issue here is whether Mr. Russell, who was a truck driver by profession, was either an independent contractor or an employee of Allied or A1 or both at the time of his accident on July 15. In order to discuss the employment issue, I think we need to understand the relationships that exist between the parties. I guess the best place to start would be with Allied and A1. A1 is a stand-alone Missouri corporation involved in the moving business. And Allied entered into an agreement, an agency contract agreement, with A1 wherein A1 would provide transportation services, including labor services, to Allied. In return, A1 would receive the Allied's interstate operating licenses and would also receive commissions for the household shipments that were booked. As I said, A1 was responsible for providing labor as part of the transportation services. The contract, this agency contract, made it very clear that there was not an employee relationship between A1 and Allied. And the contract further provided that the agency relationship and authority of A1 was limited. They did not have the right or the ability to enter into any contracts on behalf of Allied. They had no rights or authority to hire anyone on behalf of Allied. Counsel, I think you can argue there's elements of both. Employer-employee relationship, independent contract status. Let me ask you a couple of pointed questions. Is there any evidence that the claimant had any customers of his own? No. Wasn't there evidence that he hauled his freight designated as a special products assignment exclusively for customers dispatched by the respondent? Wasn't that basically his role, special products? Well, special products was a division that was set up, I think, by Allied some time ago that he got himself into well before this act. He was dispatched by the respondent. They assigned him, correct? But it's the same thing as a household good in terms of under the manifesto from the Interstate Commerce Commission. And whose ICC permits did he operate under? He operated under Allied. So what about the line of authority that says you have aspects of both? Really, the commission is called upon to make the decision. Reference is given to the commission under those facts. Well, I mean, the problem is that, first of all, there's not a hard pass rule in Illinois. And the courts have always looked at all the various factors to try and determine, you know, what was the intent of the parties. Was there an intent to have an independent contractor situation? Or whether there was, in fact, just, you know, an employment situation. And what we have is an employer or a business trying to use a contract as a way of getting around that standard. What about if the intent is not actually clear? That's arguably a mistake. Well, I think the intent here is very clear as to what was going on. I mean, if you look at the behavior of Mr. Russell, I think that the intent is perfectly clear that he considered himself an independent contractor. Now, last night I'm sitting here looking at this, and I think I pointed out in my brief where, well, he thought he got the occupational insurance. He thought that was workers' compensation insurance. And that was, to my view, an idea as to how he considered himself, what he intended himself to be. But actually what I thought last night, which was more telling, was the fact that he had it both ways before this accident. He worked the allies as a contract driver under an agreement that was signed with A1. And he worked salary doing the same thing. The only difference was that he was not using his tractor truck. He was using A1's tractor truck for that period of time. He then quit. And then he came back. And he came back and he wanted to be a contract driver. And to me, him saying that, to me, represents that he had the intent that he wanted to be an independent contractor. His tax returns make it very clear that he was operating a business. He has the claim in Missouri that he brings against both parties, as well as his own trucking company. He tells everyone that he leased himself to A1 to work. He says he's self-employed. That's not just in testimony. That's in his medical records where you're putting down your occupation. Well, I'm self-employed. Those things, in my view, make it very clear that his intent, especially on this second round, after he returned, I think, from Deakin, was that I've done it both ways. I like being an independent contractor. There's testimony to that effect? There's not testimony to that effect. I'm saying what was going through my mind. If you look at... But also, is there anything... There's not testimony to that effect.  What I'm saying is... As long as we're speculating, Kent, reasonable speculation for you that A1 no longer had a salary employee. That's very true as well. And you know what? And that's why I'm saying you look at the other factors. You look at what he did with taking depreciation off his tractor. Takes the money for the de-interest in terms of a deduction off the loan for his tractor. Internet, phones, overnight stays, even labor costs he has down there. Lists his business down there. That tells me that he thinks he's an independent contractor at the end of the day. He's doing a full deduction of those things. Now, he thinks he's an independent contractor. He's operating under the respondent's ICC permits. He has to complete a qualification application for the respondent. The respondent's name and logo is on the trailer. The claimant's uniform. The claimant's tractor cab. The respondent issued the bills of lading. And that doesn't cut against the independent contractor. Okay. But then again, you have to look at those other issues because we... This is the problem we get into with this trucking situation. We have the federal government with a concern about safety out on the roadways. And they have set up these regulations that are absolutely required in order for you to operate a truck. So... He has to have the respondent's uniform? No. No, but the other ones are more important. The drug testing obviously has to be done. You have to check the driving record. Those things are critical under the federal regulations. I mean, they just have to do that. So he's got to be checked out to make sure they can put him in a vehicle, whether he's being leased or however that situation may be. The fed regulations also, though, only provide by having that federal authority, allows him to drive. That doesn't necessarily mean that for all purposes, and I believe even Roberson talked about it. You have to comply with federal regulations. The fact that you have to turn your vehicle over, lease it over, does not necessarily make you an employee for all purposes. Those things are there for other valid reasons, not dealing with an employer-employee relationship. These are dealing with issues involving the regulation of this industry. Cutting to the chase, simply tell us why the commission's decision is against the manifest weight of the evidence. That's the hurdle you must overcome here. No, actually, you know, well, yeah. I actually think it's contrary to law because of what was presented to them. I'll go beyond this, beyond the manifest weight. So this is a de novo review? I think you can make that argument as it involves their failure or their determination that A1 was not the employer and that Allied was. And the reason I say that is Allied did not have a contract, an independent contractor contract with Mr. Russell. A1 had that contract. A1 had an equipment lease agreement for which they provided Mr. Russell's tractor, pursuant to the independent contract agreement, and provided his labor services. That's what they were hired to do when they reached the agency agreement. If you have someone who's loaning or leasing you a tractor with that person, that labor, do you not have a loaning-borrowing situation? And if you have that loaning-borrowing situation, now, mind you, counsel did not file this under a Section 1A4. He filed this two separate claims. But the provisions of the lease agreement make it very clear the obligations of A1 was to provide insurance coverage for its labor. That's a contract to the contrary, because normally liability is going to go to the borrowing employee. I'm looking at this loaning and borrowing at the end of the day, and that was never even addressed by the Commission. They ignored that evidence and clearly showed he wasn't our employee. Did you make that argument before the arbitrator and the Commission? Yeah, in the briefs. The evidence is there. We have a lease agreement that says loaning and borrowing is sitting right here in front of us. We have an agreement. We're going to take your tractor and your labor. You're going to provide insurance for that. Gentleman gets hurt. If you want to say there's an employer-employee relationship, fair enough. But the liability now goes back to A1 because they're the one who lent Mr. Russell for the special projects job. So, I mean, I believe that that's a pretty strong case and it was never really dealt with. I believe that this court, and to discuss in my brief, and I think I apologize. I think I may have said that if you had exclusive jurisdiction, I would just presume you had general jurisdiction over the contractual matter and that you have concurrent jurisdiction to entertain that. You'll have time on rebuttal, Counsel. Thank you. Counsel, please. May it please the Court, Counsel. My name is Brad Badgley. I represent Petitioner Randall Russell. This accident occurred on July 15, 2000. The matter was arbitrated on May 31, 2007. The arbitrator rendered her decision on July 6, 2007. The Industrial Commission on November 23, 2010 confirmed the arbitrator's award, as did the Circuit Court on May 13, 2011. The file before you is probably three feet thick. At each level, and I would point out at arbitration, this borrowed-loaned-employee issue was not raised as an issue. You can look at the stip sheet as easily as I can. That issue was never raised. But in all three levels of review, the arbitrator, the Commission, and the Court looked at the case law, the Weinhold decision, the Roberson decision. The words, independent contractor and a contract, do not make Petitioner an independent contractor. They look at the totality of the situation, and right to control is important. One thing I was just shocked to hear from Counsel in his argument, the reason this case is so close to the Roberson decision is that Mr. Russell owned his own truck. This is a right to control case. Mr. Russell owned his own truck. That wasn't provided by LI. Also, there's no evidence in the record that he ever carried another load for anybody while he was working. The arbitrators, the Commissioners, the Circuit Court looked at the facts. They also gave greater weight to the testimony of the treating physicians on the medical causation issues versus a sole examining physician who had been retired for 12 years. And 95% of his examinations, which is all he does, is on behalf of respondents. And quite frankly, if you look at the record, the award would support a totally permanent decision and clearly supports a 50% man as a whole award. Twelve years later, we're arguing an issue that was first raised arguably in the Circuit Court. If Counsel wants to see the Commission, that's fine. Based upon a document that was not on his exhibit list, and I use that word lightly because that exhibit list looked like a narrative if you reviewed it. The transcript, as I said, is three feet thick, a lot of duplicates. There was no discussion with the arbitrator. Simply stated, it was brought up as an afterthought. Simply stated, it is time to bring this matter to an end. And so I sincerely hope that the decision, as rendered by the arbitrator, confirmed by the Industrial Commission and the Circuit Court, is permitted to stand. Thank you. I have a question about A-1 here. Is there anything in the record to show that A-1 had returned to A-1, that A-1 had salary? No. I'm sorry. A-1 was the bookkeeper. Okay. Okay. Thank you. Thank you. Good morning, Your Honors. Counsel. My name is Brian McVeary. I represent A-1 Music and Storage. One issue I want to address here, and to paint a picture for you, if I can, and Mr. Bergeson stole a little bit of my thunder, this action occurred in 2000. It was litigated for the better part of seven years in Missouri and Illinois. When I came to trial in May of 2007, the deposition of my client had been taken and there had been great exploration of circumstances of Mr. Russell's on-again, off-again relationship with A-1 Music and Storage. What is relevant to this court's review is what was the status at the time that the accident that would happen back in the 80s. And Mr. Powers, to his credit, did acknowledge that, in fact, that Mr. Russell left A-1 Music and Storage, went to work for another carrier, then came back and said, I'd like to drive for Allied. Can you help me out? That's the circumstance with A-1. That's why A-1 is dragged into this. So we have a trial on May 31, 2007. It's a specially set day because it was a big case, a lot of parties, and the exhibits from Allied were this thick. You've seen the record. I was astounded. One thing that was not in there was this alleged acquittal lease. We tried the case. It took a long time. We tried the case that day. The arbitrator graciously allowed Allied additional time to bring in a witness who, seven years of litigation, could not be disposed, could not be there on the day of trial, and said, we graciously allow this deposition to go forth. The deposition occurs, and lo and behold, an acquittal lease comes up for the first time. It didn't come up during the deposition of my client a year and a half before. It's not in his lease. It's not on his exhibit list. And as I said in my brief, the arbitrator, as you know, sits down and says, what are the issues, gentlemen? Indemnity, bond, servant, none of that came up at that time. Two weeks later during the deposition, Allied tries to sandbag everyone by bringing in a lease out of nowhere. And I objected. I said, it's not relevant. Why is it? That issue was not raised at hearing. It was not raised in front of the commission. The first time that came up was in the circuit court. That acquittal lease was properly excluded. As you know, the trial judge, an arbitrator, and a commission has discretion to exclude evidence. It's especially not an abuse of discretion when the issue isn't even before the arbitrator. What relevance did that even have? And it was brought in at the last minute. After seven years of litigation, this came up during a deposition. With regard to A1 and Allied, the Roberson case says contracts are great. We all know these contracts all say persons are independent contractors. We can't look at that. Who is in control? Who are you going to believe contracts with your own lying eyes? What is the status of the case? It's been pointed out that Mr. Russell, whatever his relationship is with Allied, was not an employee of A1. He said it. They're my accountant. They don't know where I am from day to day. Mr. Duncan, my client, said, we don't know where he is. He doesn't talk to us. He calls us when he needs money. They don't dispatch him.  They don't have authority outside the state of Missouri. They can't send him outside the state of Missouri. He said, we're local here. We can contract to send people elsewhere, but we operate in Missouri. It's a small company. He was an employee in the past, but that's not relevant to what happened in 2000. Thank you, Your Honors. I have a short chance for some comments. Thank you very much. A1 is not an accounting service. A1 is a moving company. A1 was getting paid for the monies that were being brought in for all the shipments that either Mr. Russell did or whoever else that they sent over to the League of Supreme Court. This whole thing with accounting, and they weren't getting anything out of it, is they were making money. They would take their percentage out of the commission, and then they would then settle out with Mr. Russell. So this whole accounting thing, I don't care how Mr. Russell describes it, there's a contract there to provide transportation services, the agency contract. That's what they did under the contract. They were paid for that. That was part of the deal. Control of the work, just briefly. What control did Allied have other than you can go ahead and pick up the load? He didn't have to pick it up. He wasn't required to. He could if he wanted to. He could also work other places. He wasn't tied to that. He could take his own routes, got his own fuel, did whatever he needed to do. It was up to him. The only thing that Allied wanted was to make sure that get it done, whatever it is. You figure it out. And by sheer coincidence, he had no other customers. Well, you know, and I guess, just as has been mentioned earlier about speculating, maybe he had a lot of business with Allied. He liked working for them. I don't know. Maybe special products. Who knows? But the bottom line is he didn't have to accept those dispatches. He didn't have to do that. This whole thing with his lease agreement, that lease agreement was tied into the contract, the agency contract. Proofs were not closed when I took the deposition of Mr. Lambert. We all do deaths every day. Both of them are medical. And you know what we end up doing? As they did in this case, they attached the medical records to the deposition. But putting that contract aside, Mr. Lambert had personal, direct knowledge of the terms. He testified to them. The arbitrator cites to all of it. So in terms of them suggesting, and I don't appreciate this sandbagging comment, it was related. And I also find it interesting that apparently counsel for A1 does not know or did not know about an equipment lease agreement that his own client signed, that A1 signed. That just, to me, is striking that there's some big surprise here. He knew there was a lease agreement. He knew that was an issue. He knew that whole thing. The last thing, just quickly, Roberson. The difference between this case, Roberson, Ware, Early, is that in each of those cases, the trucking companies had signed an agreement with the worker about an independent contractor type of status. We don't have an agreement between Allied and Mr. Russell. We don't have privity, do we? So I'm trying to figure out, you're going to extend the law now. We didn't hire him. He was leased to us. And so therefore, we have an employment relationship based upon a lease, which there is evidence in the record which sets forth the terms of that lease. But I think if we go forward with Roberson and you decide this in terms of, well, this is the Roberson situation, where's our contract? We didn't even have a contract with Mr. Russell. Thank you. The court will take the matter under driver for disposition.